IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| XYLEM INC. and PURE TECHNOLOGIES U.S. INC., | § § § |
| Plaintiffs, | § § |
| v. | § § |
| INSIGHT WATER TECHNOLOGIES, INC. and XIANXIE KONG, | § § § |
| Defendants. | § § |

Civil Action No. _____

## COMPLAINT

Plaintiffs, Xylem Inc. ("Xylem") and Pure Technologies U.S. Inc. ("Pure"), by and through their attorneys, file this Complaint against Defendants, Insight Water Technologies, Inc. ("Insight") and Xianxie Kong ("Kong"), and, in support thereof, aver as follows:

## STATEMENT OF THE CASE

1. Xylem and Pure are technology companies. Together, they have spent many years and hundreds of millions of dollars developing technologies to turn them into marketable products. At its core, technology is the manifestation of ideas resulting in "the practical application of knowledge."[1] Xylem has succeeded in the marketplace by having better ideas -- that is to say, better technology and better intellectual property -- than its competitors. Xylem has a compelling interest in protecting its knowledge against misuse because if Xylem's intellectual property were freely-available to everyone, then Xylem would lose its competitive advantage.

2. Kong spent twenty-five years, from 1998 to 2023, working for Xylem and its predecessors-in-interest. During that time, he rose from being a Research Scientist to becoming

---

[1] *See* https://www.merriam-webster.com/dictionary/technology (last visited July 24, 2024).

the Vice President of Strategic Technology Initiatives.  At every step along the way, Kong was exposed to Xylem's highly-sensitive intellectual property, including its trade secrets.  Indeed, Kong played a key role in Xylem's development of some of its most successful pipeline inspection tools like PipeDiver, PipeWalker, and SmartBall -- tools that are based on intellectual property that belongs to Xylem.

3. Given the sensitive nature of Kong's work and his position within the company, Kong knew that he was subject to Xylem's Code of Conduct and its Intellectual Property Policy, which required him to safeguard Xylem's intellectual property even after his employment ended.

4. Kong voluntarily left Xylem's employment in June of 2023, apparently intending to take Xylem's intellectual property with him, join a new company, and start competing with Xylem by improperly using Xylem's own trade secrets against it.

5. Less than a month after Kong left Xylem, Myron Shenkiryk, who had been Pure's Director of Business Development from April 2001 through December 2021, incorporated Insight in Delaware.  Shortly thereafter, Kong joined Insight and is currently its Chief Technology Officer.

6. Within months of Insight's incorporation, Kong and Insight began showcasing their "own" pipe inspection products, which are blatant knock-offs of Xylem's market-leading products like PipeDiver, PipeWalker, and SmartBall.  It would be impossible for an individual like Kong and a small start-up company like Insight to introduce brand-new, highly-technical, products into the market on such a short timeframe if they were competing fairly.  But they aren't.  Rather than investing the time and resources ordinarily needed to develop sophisticated pipe inspection products, Kong and Insight are misappropriating Xylem's trade secrets in an attempt to obtain an unfair competitive advantage.

7. Xylem now brings this action to stop Kong and Insight from using Xylem's trade secrets. Xylem seeks an injunction against Kong's and Insight's continued misappropriation of Xylem's technology; monetary damages for the harm that Kong and Insight have already inflicted upon Xylem; and punitive damages that are justified by Kong's and Insight's willful and malicious misappropriation of Xylem's trade secrets.

## PARTIES

8. Xylem is a corporation organized under the laws of the State of Indiana with its principal place of business at 301 Water Street, SE, Washington, District of Columbia 20003.

9. Pure is a corporation organized under the laws of the State of Delaware with its principal place of business at 8920 State Route 108, Suite D, Columbia, Maryland 21045.

10. On information and belief, Insight is a corporation organized under the laws of the State of Delaware with its principal place of business at 12931 Caminito De Las Olas, Del Mar, California 92014.

11. On information and belief, Kong is a natural person domiciled and residing at 342 Fairlawn Avenue, North York, Ontario, Canada.

## JURISDICTION AND VENUE

12. This Court has original subject matter jurisdiction of this action pursuant to the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836(c), and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the other claims asserted in this matter pursuant to 28 U.S.C. § 1367 because they are so related to the federal misappropriation of trade secrets claims that they form part of the same case or controversy under Article III of the United States Constitution.

13. This Court has personal jurisdiction over Insight because it is a corporation organized under the laws of the State of Delaware.

14. This Court has personal jurisdiction over Kong pursuant to Federal Rule of Civil Procedure 4(k)(1) and 10 Del. C. § 3104(c)(1)-(4) or, alternatively, pursuant to Federal Rule of Civil Procedure 4(k)(2).

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(c).

## FACTS

16. Xylem is a leading global water technology company committed to solving the world's critical water challenges with innovation and expertise. Xylem is a Fortune 500 publicly-listed multinational company headquartered in Washington, D.C. With 23,000 employees across the globe enabling customers to optimize water and resource management and helping communities in more than 150 countries become water-secure, Xylem delivered revenue of $8.1 billion in 2023.

17. Pure is a subsidiary of Xylem that works with pipeline owners around the world to deliver actionable data that drives proactive, long-term asset management. Pure leverages proven condition assessment technology, world-class engineering expertise, and advanced analytics to optimize network reliability, maximize pipeline life, and minimize capital costs.

18. Among Xylem/Pure's leading products are the Pure Technologies PipeDiver® Condition Assessment Platform ("PipeDiver"); the Pure Technologies PipeWalker™ Condition Assessment Platform ("PipeWalker"); and the Pure Technologies SmartBall® Inline Free-Swimming Inspection Platform ("SmartBall").

19. PipeDiver is an inline, free-swimming tool that is used to assess the conditions of water and wastewater pipelines. It employs high-resolution electromagnetic or ultrasonic data to

provide utilities with a comprehensive understanding of pipe wall condition. It operates while the pipeline remains in service and is able to pinpoint areas of pipe wall distress in metallic and concrete pressure pipe. PipeDiver has been extensively engineered so that it can be launched and extracted through existing appurtenances, which minimizes expensive civil work that would otherwise make inspection unfeasible. In complex operational environments, PipeDiver navigates valves, sharp bends, and trees and is able to inspect long distances in a single deployment.

20. PipeWalker is a piloted condition assessment platform for large-diameter pipeline inspection. It uses high-resolution electromagnetic data and visual inspection information to provide utilities with a comprehensive understanding of pipe wall condition. It is operated in dewatered pipelines by a team of highly trained technicians. It is used for inspecting large-diameter, concrete water pipelines that can be removed from service.

21. SmartBall is a free-swimming inspection tool used to detect leaks and gas pockets and to map pipeline networks. The platform assesses pressurized water and wastewater pipelines in a single deployment, without disrupting regular service. The SmartBall platform provides utilities with pipeline condition data to make informed rehabilitation and management decisions on a pipe-by-pipe basis.

22. When Xylem acquired Pure Technologies Ltd. ("Pure Ltd."), which was a Canadian company, in 2018, it acquired all of Pure Ltd.'s intellectual property.

23. Prior to that, Pure Ltd. had acquired The Pressure Pipe Inspection Company Ltd. ("PPIC"), which was also a Canadian company, in 2010, and acquired all of PPIC's intellectual property.

24. Kong worked for PPIC and then Pure Ltd. and was involved in the initial development of PipeDiver and PipeWalker, and he later contributed to the further development of SmartBall.

### Kong's Employment Relationship with Xylem / Pure

25. When Pure Ltd. acquired PPIC in 2010, it retained Kong and employed him as Pure Ltd.'s Vice President, Research & Development.

26. While with Pure Ltd., Kong was integral to the further development and subsequent iterations of the PipeDiver, PipeWalker, and SmartBall tools, as well as to other ultrasonic and acoustic tools.

27. When Xylem acquired Pure Ltd. in 2018, it retained Kong and employed him as Vice President, Strategic Technology Initiatives.

28. Kong left Xylem in June 2023 and founded XK Innovate, Inc. ("XK Innovate") on July 4, 2023, in Toronto, Ontario, Canada.

29. Kong solicited other Xylem and/or Pure employees in the Summer of 2023 to join him at XK Innovate, including Hongwei Zhang, Jeffrey Kwan, and Leo Liu.

30. On July 11, 2023, Myron Shenkiryk, who had been the Director of Business Development for Pure from April 2001 through December 2021, incorporated Insight in Delaware.

31. Kong is now an officer of Insight, with the title of Chief Technology Officer.

### Insight's and Kong's Misappropriation of Xylem's Trade Secrets

32. It has become evident that Kong left Xylem to form and/or join a new company with the intention of using the knowledge that he obtained at PPIC, Pure, and Xylem -- *i.e.*,

Xylem's intellectual property -- to build tools to complete with Xylem's and Pure's products, including PipeDiver, PipeWalker, and SmartBall.

33. For example, Insight's advertised tools include a free-swimming high-resolution assessment tool, which it calls its "XK Series" (a clear reference to Xianxie Kong's initials and/or his company, XK Innovate), that is a replica of Xylem's PipeDiver, and a "free-swimming multi-sensor sphere" that is based on Xylem's SmartBall.

34. Upon information and belief, Insight's products use confidential trade secrets that Kong acquired through his prior employment with PPIC, Pure Ltd., and Xylem -- trade secrets that belong to Xylem. Among those trade secrets are the following which apply to Xylem's free-swimming platforms:

(a) The ultrasonic tracking method used to determine the tool's location;

(b) Knowledge of feature passage testing, specifically butterfly valves, and what setups achieve optimal passage rates as well as the factors that must be considered;

(c) Operational knowledge of the method to inspect pressurized pipelines (flow speed, pressure range, lining conditions) through which an inline tool must operate in water and wastewater pipes;

(d) The balancing method and tool rigidity necessary for stable data collection in pressurized pipes, including optimized positioning of the tool within the pipe itself;

(e) Tool rigidity required to reduce the risk of becoming lodged in an operating pipeline;

(f) Mechanical design and sealing techniques to protect electronics and other sensitive components in a pipeline operating environment;

(g) Size, material, and the stiffness of sails and petals needed to optimize tool stability in varying operating conditions while ensuring inline passage; and

(h) Methods for packing and protecting components for safe transportation.

35. Those trade secrets also include the following which apply to Xylem's non-destructive sensing methods:

(a) Electromagnetic sensing techniques and their applicability to various pipe designs and diameters;

(b) The design and production of detectors and excitors including the coil position;

(c) Optimal frequencies to use to detect wire breaks for different pipe designs;

(d) Acceptable signal-to-noise ratios to detect broken wires and associated energy requirements of the system;

(e) The acoustic characteristics of wire breaks and the use of fiber optic sensing to monitor pipes in real time;

(f) The use of inertial measurement units in inline inspection tools to correlate the tool and data to known pipe locations;

(g) Methods of laser measuring to determine joint gap widths;

(h) Methods for positioning lighting and cameras to maximize video quality in the operational conditions of a live pipeline; and

(i) The use of magnetometers, strain gauges, and other sensors to aid in accurate locating of pipes and pipe defects.

36. Upon information and belief, Kong and Insight have misappropriated, and continue to misappropriate, Xylem's trade secrets their own benefit. Kong and Insight have

utilized and disclosed and/or inevitably will utilize and disclose Xylem's trade secrets, which were obtained unlawfully, for their own benefit.

### Kong's Breach of the 2022 Restricted Stock Unit Agreement

37. During Kong's employment with Xylem, Kong and Xylem entered into a contract, called the 2022 Restricted Stock Unit Agreement, effective as of March 1, 2022 (the "2022 RSU Agreement"), which permitted Kong to participate in Xylem's equity incentive plan.

38. Under the 2022 RSU Agreement, Xylem granted 288 Restricted Stock Units ("RSUs") to Kong.

39. The 2022 RSU Agreement provides: "The RSUs are notional units of measurement denominated in shares of common stock (*i.e.*, one Restricted Stock Unit is equivalent in value to one share of common stock of the Company)."

40. The 2022 RSU Agreement further provides: "The RSUs represent an unfunded, unsecured right to receive shares and dividend equivalent payments in the future if the conditions in the [Company's 2011 Omnibus Incentive] Plan and this Agreement are satisfied."

41. The RSUs in the 2022 RSU Agreement are subject to certain terms and conditions. Among those terms and conditions are "Participant Obligations" contained in subsection 2(i) of the 2022 RSU Agreement, which are binding on Kong and include the following:

> Participant Obligations. In partial consideration for the award of these RSUs, if at any time during the period between the Grant Date and the 12-month period following the Participant's termination of Employment (the "Obligation Period"), the Participant: (i) directly or indirectly, hires or solicits or arranges for the hiring or solicitation of any employee or customer of the Company or its Affiliates, or encourages any employee to leave the Company or an Affiliate; (ii) directly or indirectly, assist in soliciting in competition with the Company the business of any current customer, distributor or dealer or other sales or distribution channel partners of the Company; (iii)

uses, discloses, misappropriates or transfers confidential or proprietary information concerning the Company or its Affiliates (except as required by the Participant's work responsibilities with the Company or its Affiliates); or (iv) engages in any activity in violation of Company policies, including the Company's Code of Conduct, or engages in conduct materially adverse to the best interests of the Company or its Affiliates; the RSUs, whether previously vested or not, may be cancelled in full, and the Participant may be required to return to the Company any shares received on settlement of vested RSUs or the net after-tax income from the disposition of any shares received upon settlement of vested RSUs, unless the Committee, in its sole discretion, elects not to cancel the RSUs and/or elects not to recover any income from settled RSUs or unless applicable law prohibits such action.

42. Pursuant to the 2022 RSU Agreement, Xylem distributed, and Kong accepted, 96 RSUs on April 1, 2022.

43. Kong's employment with Xylem ended on June 9, 2023.

44. Thus, the "Obligation Period" referenced in subsection 2(i) of the 2022 RSU Agreement ran for the twelve-month period from June 10, 2023, through June 10, 2024.

45. During that "Obligation Period," Kong breached his "Participant Obligations" under the 2022 RSU Agreement in numerous ways, including the following:

(a) Kong directly or indirectly hired or solicited or arranged for the hiring or solicitation of one or more employees and/or customers of Xylem or its affiliates, or encouraged one or more employees to leave Xylem or one of its affiliates, including by hiring and/or soliciting Hongwei Zhang, Jeffrey Kwan, and Leo Liu in the summer of 2023;

(b) Kong directly or indirectly assisted in soliciting in competition with Xylem the business of one or more of Xylem's current customers, distributors, dealers, or other sales or distribution channel partners;

(c)     Kong used, disclosed, misappropriated, and/or transferred confidential or proprietary information concerning Xylem or its affiliates in a manner that was not required by Kong's work responsibilities for Xylem or its affiliates; and

(d)     Kong engaged in activity in violation of Xylem's policies, including Xylem's Code of Conduct and its Intellectual Property Policy, and/or engaged in conduct materially adverse to the best interests of the Company or its Affiliates.

46.     As a result of Kong's breaches of the 2022 RSU Agreement, Xylem is entitled to cancel all RSUs granted to Kong under the 2022 RSU Agreement and to require Kong to return to Xylem the 96 shares that Kong received on settlement of vested RSUs or the net after-tax income from the disposition of those shares.

**Kong's Breaches of Xylem's Code of Conduct and Intellectual Property Policy**

47.     Xylem maintains a Code of Conduct that applies to all of its employees.

48.     As a condition of his employment, Kong agreed to abide by Xylem's Code of Conduct.

49.     Xylem's Code of Conduct requires, *inter alia*, its employees to keep company assets -- including Xylem's information assets, such as its intellectual property, business strategy and processes, customer lists, and pricing details -- safe from theft, loss, waste, or abuse and to ensure that they are used only to promote Xylem's business interests.

50.     Xylem also maintains an Intellectual Property Policy that applies to all of its employees.

51.     As a condition of his employment, Kong agreed to abide by Xylem's Intellectual Property Policy.

52. Xylem's Intellectual Property Policy requires, *inter alia*, its employees to protect company proprietary information, including trade secrets, even after their employment with Xylem has ended.

53. Kong's conduct as alleged in the preceding paragraphs violated both Xylem's Code of Conduct and Xylem's Intellectual Property Policy.

<u>**COUNT I**</u>
<u>**MISAPPROPRIATION OF TRADE SECRETS**</u>
<u>**UNDER THE DEFEND TRADE SECRETS ACT**</u>
<u>**(18 U.S.C. §§ 1836, ET SEQ.)**</u>

54. Plaintiffs incorporate the above allegations as if fully set forth herein.

55. Through his employment with Plaintiffs and his performance of responsibilities for Plaintiffs, Kong was provided access to and possessed trade secrets and confidential information of Plaintiffs.

56. Plaintiffs' trade secrets are not generally known to their competitors.

57. Plaintiffs' trade secrets were developed and maintained at great expense to Plaintiffs.

58. Plaintiffs took reasonable measures to protect the confidentiality of their trade secrets, including using password-protected networks and implementing an intellectual property policy.

59. The confidential information possessed by Kong, which belongs to Plaintiffs, are considered trade secrets under the DTSA because the information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, and the information is the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839.

60. The trade secrets at issue relate to products or services used in, or intended for use in, interstate or foreign commerce.

61. Defendants misappropriated Plaintiffs' trade secrets and/or inevitably will misappropriate Plaintiffs' trade secrets, by using Plaintiffs' trade secrets without Plaintiffs' consent.

62. Defendants misappropriation of Plaintiffs' trade secrets has caused harm to Plaintiffs.

63. Defendants will be, or have been, unjustly enriched by the misappropriation of Plaintiffs' trade secrets and confidential information, and, unless restrained, will continue to use, actually use, divulge, inevitably disclose, acquire, and/or otherwise misappropriate Plaintiffs' trade secrets and confidential information.

64. Defendants' actual and/or threatened misappropriation has been willful and malicious.

65. As a result of the actual and/or threatened misappropriation of Plaintiffs' trade secrets and confidential information, Plaintiffs have lost business expectancies, trade secrets, and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of the Court.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants in an amount to be proven at trial, injunctive relief against Defendants, plus punitive damages, costs, interest, attorneys' fees, and such other and further relief as the Court may deem proper.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS
## UNDER THE DELAWARE UNIFORM TRADE SECRETS ACT
## (6 DEL. C. §§ 2001, ET SEQ.)

66. Plaintiffs incorporate the above allegations as if fully set forth herein.

67. Through his employment with Plaintiffs and his performance of responsibilities for Plaintiffs, Kong was provided access to and possessed trade secrets and confidential information of Plaintiffs.

68. Plaintiffs' trade secrets are not generally known to their competitors.

69. Plaintiffs' trade secrets were developed and maintained at great expense to Plaintiffs.

70. Plaintiffs took reasonable measures to protect the confidentiality of their trade secrets including using password-protected networks and implementing an intellectual property policy.

71. The confidential information possessed by Kong, which belongs to Plaintiffs, are considered trade secrets under the Delaware Uniform Trade Secrets Act, 6 Del. C. §§ 2001, *et seq.*, because the information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use, and the information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. 6 Del. C. § 2001.

72. Defendants misappropriated Plaintiffs' trade secrets and/or will inevitably misappropriate Plaintiffs' trade secrets, by using Plaintiffs' trade secrets without Plaintiffs' consent.

73. Defendants misappropriation of Plaintiffs' trade secrets has caused harm to Plaintiffs.

74. Defendants will be, or have been, unjustly enriched by the misappropriation of Plaintiffs' trade secrets and confidential information, and, unless restrained, will continue to use,

actually use, divulge, inevitably disclose, acquire, and/or otherwise misappropriate Plaintiffs' trade secrets and confidential information.

75. Defendants' actual and/or threatened misappropriation has been willful and malicious.

76. As a result of the actual and/or threatened misappropriation of Plaintiffs' trade secrets and confidential information, Plaintiffs have lost business expectancies, trade secrets, and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of the Court.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants in an amount to be proven at trial, injunctive relief against Defendants, plus punitive damages, costs, interest, attorneys' fees, and such other and further relief as the Court may deem proper.

## COUNT III
## UNFAIR COMPETITION

77. Plaintiffs incorporate the above allegations as if fully set forth herein.

78. By virtue of Kong's employment with Plaintiffs and performance of Kong's responsibilities, Plaintiffs provided Kong with access to and possession of Plaintiffs' trade secrets, as set forth above.

79. Defendants are misappropriating Plaintiffs' trade secrets for their own self-interests to gain an unfair competitive advantage in competing with Plaintiffs.

80. Accordingly, Defendants are affecting the marketplace by wrongly interfering with Plaintiffs' legitimate business expectancies.

81. As a consequence of Defendants' unfair competition, Plaintiffs have been injured and face irreparable injury. Plaintiffs are threatened with the loss of business expectancies, losing clients, losing employees, further misuse of their confidential information and trade

secrets, and loss of goodwill in amounts which are impossible to determine, unless Defendants are enjoined and restrained by order of this court.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants in an amount to be proven at trial, plus costs, interest, attorneys' fees, and such other and further relief as the Court may deem proper.

### COUNT IV
### BREACH OF CONTRACT
### (Against Defendant Kong Only)

82. Plaintiffs incorporate the above allegations as if fully set forth herein.

83. The 2022 RSU Agreement constitutes a valid and enforceable contract between Xylem and Kong.

84. Kong breached the 2022 RSU Agreement by failing to comply with the terms and conditions of the contract.

85. Kong's breach of the 2022 RSU Agreement caused damage to Xylem in an amount to be proven at trial.

86. In addition, Kong breached Xylem's Code of Conduct and its Intellectual Property Policy by failing to safeguard and/or misusing Xylem's information assets, which breaches have also caused damage to Xylem in an amount to be proven at trial.

87. Any and all conditions precedent to the filing of this action have been satisfied or waived.

WHEREFORE, Xylem demands judgment in its favor and against Kong in an amount to be proven at trial, plus costs, interest, and such other and further relief as the Court may deem proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully demands judgment against Defendants for the relief requested herein.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  July 25, 2024

Respectfully submitted,

ECKERT SEAMANS CHERIN & MELLOTT, LLC

 */s/ Mark L. Reardon*
Mark L. Reardon (DE ID 2627)
mreardon@eckertseamans.com
Paul S. Seward (DE ID 6381)
pseward@eckertseamans.com
222 Delaware Avenue, Suite 700
Wilmington, Delaware 19801
(302) 574-7400 (tel)
(302) 574-7401 (fax)

Scott D. Cessar (*pro hac vice* to be filed)
scessar@eckertseamans.com
Scott A. Bowan (*pro hac vice* to be filed)
sbowan@eckertseamans.com
600 Grant Street, 44th Floor
Pittsburgh, Pennsylvania 15219
(412) 566-6000 (tel)
(412) 566-6099 (fax)

*Attorneys for Plaintiffs,*
*Xylem Inc. and Pure Technologies U.S. Inc.*